Matter of Shanna O. v James P. (2019 NY Slip Op 07455)





Matter of Shanna O. v James P.


2019 NY Slip Op 07455


Decided on October 17, 2019


Appellate Division, Third Department



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided and Entered: October 17, 2019

526672

[*1]In the Matter of Shanna O., Appellant,
v
James P., Respondent. (Proceeding No. 1.)
In the Matter of Amanda P., Respondent,
v
James P., Respondent, and Shanna O., Appellant. (Proceeding No. 2.)

Calendar Date: September 11, 2019

Before: Egan Jr., J.P., Lynch, Mulvey and Devine, JJ.


Pamela B. Bleiwas, Ithaca, for appellant.
Michelle I. Rosien, Philmont, for Amanda P., respondent.
Veronica M. Gorman, Binghamton, attorney for the child.



Mulvey, J.
Appeal from an order of the Family Court of Broome County (Connerton, J.), entered April 10, 2018, which, among other things, granted petitioner's application, in proceeding No. 2 pursuant to Family Ct Act article 6, for custody of the subject child.
Shanna O. (hereinafter the mother) and respondent James P. (hereinafter the father) are the parents of the subject child (born in July 2005). In the fall of 2007, the father moved to New York, leaving the child and the mother in the state where they had all been living together. In April 2008, the mother allowed the father to take the child for an extended visit. The father then obtained a Family Court order granting him sole custody, so the child remained living with the father and petitioner Amanda P. (hereinafter the stepmother), who later married the father. From 2008 until the mother moved back to this state in 2012, the mother visited the child approximately 16 times and admits that, at one point, she went three years without seeing the child. In 2012, the mother began daytime visits with the child and progressed into visits every other weekend, as embodied in a 2013 Family Court order.
In the fall of 2016, the father informed the mother that he had separated from the stepmother but left the child in the stepmother's care. The mother began communicating more regularly with the stepmother and, based on the father's approval, began visiting with the child every weekend. In early May 2017, the stepmother asked the father to completely leave the residence. At the end of July 2017, the mother filed a petition against the father seeking custody. The stepmother later filed a custody petition against both parents. After hearings on both petitions, Family Court awarded custody to the stepmother and visitation to each parent. The mother appeals.
Although Family Court has rendered a thorough and thoughtful decision, it erred in basing its custody determination on the premise that the stepmother was a de facto parent who had standing to seek custody under Domestic Relations Law § 70 (a) pursuant to the Court of Appeals decision in Matter of Brooke S.B. v Elizabeth A.C.C. (28 NY3d 1 [2016]). Domestic Relations Law § 70 (a) provides that "either parent" may apply to a court for custody of a child residing in the state. In Matter of Brooke S.B., the Court expanded the definition of the word parent — a term not defined in the statute — to include a partner to a biological or adoptive parent where the partner has demonstrated "by clear and convincing evidence that the parties agreed to conceive a child and to raise the child together" (Matter of Brooke S.B. v Elizabeth A.C.C., 28 NY3d at 14). While the Court noted that "[a] growing body of social science reveals the trauma children suffer as a result of separation from a primary attachment figure — such as a de facto parent — regardless of that figure's biological or adoptive ties to the children" (id. at 25), the Court also noted that courts "must, however, protect the substantial and fundamental right of biological or adoptive parents to control the upbringing of their children" (id. at 26). The Court was not considering "whether to allow a third party to contest or infringe on those rights; rather, the issue [was] who qualifies as a 'parent' with coequal rights" (id.).
The Court purposely kept its holding narrow and did not expand it to include all or most stepparents, or all people who could establish a functional equivalency to a parent (id. at 27-28). While rejecting the premise that it was required in that case to "declare that one test would be appropriate for all situations" (id. at 27), the Court noted that, based on the Legislature's "use of the term 'either,' the plain language of Domestic Relations Law § 70 clearly limits a child to two parents, and no more than two, at any given time" (id. at 18 n 3). As the reasoning relied upon by Family Court would result in the child having three parents — the mother, the father and the stepmother — who would all simultaneously have standing to seek custody, such reasoning does not comport with the holding in Matter of Brooke S.B. Therefore, to establish standing to seek custody as a nonparent, the stepmother had to demonstrate extraordinary circumstances.
"Notwithstanding Family Court's failure to make the threshold determination regarding extraordinary circumstances, we may independently review the record to make such a determination where, as here, the record has been adequately developed" (Matter of Roth v Messina, 116 AD3d 1257, 1258-1259 [2014] [citations omitted]; see Matter of Rosso v Gerouw-Rosso, 79 AD3d 1726, 1727 [2010]; Matter of Michael G.B. v Angela L.B., 219 AD2d 289, 292 [1996]). "A parent has a claim of custody of his or her child, superior to that of all others, in the absence of surrender, abandonment, persistent neglect, disruption of custody over an extended period of time or other extraordinary circumstances" (Matter of Brown v Comer, 136 AD3d 1173, 1174 [2016] [internal quotation marks, brackets and citations omitted]; see Matter of Curless v McLarney, 125 AD3d 1193, 1195 [2015]). "The extraordinary circumstances analysis must consider the cumulative effect of all issues present in a given case, including, among others, the length of time the child has lived with the nonparent, the quality of that relationship and the length of time the parent allowed such custody to continue without trying to assume the primary parental role" (Matter of Brown v Comer, 136 AD3d at 1174 [internal quotation marks, ellipsis and citations omitted]). Only after the nonparent establishes extraordinary circumstances may a court consider the best interests of the child (see id. at 1176; Matter of Banks v Banks, 285 AD2d 686, 687 [2001]).
This situation is unlike those where a parent simply left a child in the care of a relative, such as a grandparent or cousin (compare Matter of Brown v Comer, 136 AD3d at 1175). Here, the child was residing with the other parent — the father — pursuant to a court order. The mother did not originally expressly relinquish the child to the stepmother. Rather, the stepmother assumed parental responsibilities due to her relationship with the father and based on his custodial authority. Nevertheless, in considering the cumulative effect of all the issues, we note that the mother had very little contact with the child for five years, including not seeing him at all for three continuous years, while the child was at a formative age and being raised by the father and the stepmother. Starting in 2012, the mother began consistently exercising her visitation and has continued to do so. However, the mother remained uninvolved in the child's medical and educational life and was only minimally involved in his extracurricular activities. Although she contends that the father did not provide information on these topics when asked, the mother did not exercise her rights under the custody order to obtain such information on her own, nor did she ask the stepmother for information on most of these topics, despite being directed to do so by the father. For example, the mother complained that the father and the stepmother did not provide information about school activities, but she acknowledged that the school calendar was available online. The mother asserted that she was stymied in her attempts to obtain records from the child's elementary school, but she did not later attempt to contact the child's middle school, which he had been attending for two years at the time of the hearing. Despite dropping the child off at soccer events during her visitation time, the mother did not know the names of any of his coaches or the schedule for soccer practices and games that did not take place on her weekends. Overall, she took little initiative to learn about the child's life outside of her parenting time.
The child, who was 12 years old at the time of the hearing, had lived with the stepmother since he was 2½ years old. Throughout that time, the stepmother provided the day-to-day care for the child and they formed a close bond (compare Matter of Burton v Barrett, 104 AD3d 1084, 1085-1086 [2013]). Though the mother cannot be faulted for allowing the child to remain living with the stepmother while the custodial father was also present in the household, the mother testified that the father informed her in September or October 2016 that he no longer lived with the stepmother and the child. The mother further testified that she discovered on June 28 or 29, 2017 that the child was going to a summer recreation program, rather than spending extended time with her in the summer, yet she did not file her petition until July 28, 2017 (compare Matter of Hawkins v O'Dell, 166 AD3d 1438, 1439 [2018]; Matter of Burton v Barrett, 104 AD3d at 1086). It is unclear why the mother waited approximately 10 months after learning that the child was no longer living with the father to seek custody, and thereby attempt to assume the primary parental role. Instead, she chose to leave the child in the stepmother's continued care. Under these facts, the stepmother established extraordinary circumstances providing her with standing to seek custody (see Matter of Curless v McLarney, 125 AD3d at 1196-1197; Matter of Tucker v Martin, 75 AD3d 1087, 1088-1090 [2010]; Matter of Isaiah O. v Andrea P., 287 AD2d 816, 817 [2001]).
Moving to the best interests of the child, he has lived with the stepmother since he was a toddler, has a close bond with her and was described as inseparable from his half brother, who also lives with them. The child has always attended schools in the same district, has an educational plan to address his difficulties, participates in sports in that district and all of his friends are there. The mother lives in a different school district. The stepmother has been managing the child's medical conditions for a decade, whereas the mother did not even know the names of his doctors. The stepmother has been communicating with the mother regarding visits and providing the majority of the transportation; the mother has no vehicle and her driver's license is suspended, although she drove to drop the child off on at least some occasions. It appears that the stepmother would be most likely to foster a relationship between the child and the other person, as demonstrated by the mother describing it as "[u]nfortunate[]" that the child had lived with the stepmother on a day-to-day basis for a decade and formed a bond with her. Although not determinative, the child's attorney advocated that the child continue living with the stepmother (see Matter of Rivera v LaSalle, 84 AD3d 1436, 1438 [2011]). Overall, because the stepmother has been the most consistent parental figure in the child's life and will maintain stability for him, it is in his best interests to live primarily with her (see Matter of Curless v McLarney, 125 AD3d at 1197). Accordingly, we affirm the award of custody and primary residence to the stepmother.
Egan Jr., J.P., Lynch and Devine, JJ., concur.
ORDERED that the order is affirmed, without costs.